SAMUEL MOORE, TACITUS MOORE, THOMAS MOORE and NICHOLAS BELL and ESTHER, his Wife, and PRETTYMAN CANNON and HARRIET, his Wife, Representatives of Thomas Moore, and TACITUS MOORE, Administrator of Thomas Moore v. THOMAS RIDER, JACOB MARINE, DR. THOMAS ROBERTSON, and OUTERBRIDGE HORSEY, Administrators of William Moore.

Court of Chancery. Sussex. July 26, 1817.

*Ridgely's Notebook I, 115.*

*Robinson* for complainants.

*Vandyke* for defendants.

*Robinson,* for complainants, reads bill, which states that complainants [are the] heirs at law and Tacitus [is the] administrator of Thomas Moore deceased. Ann LeCompte seised in fee of land in Little Creek Hundred, February 5, 1783, made her will and devised as follows, "I give to my son William Moore three tracts of land (naming them) in fee, provided my son William Moore pay unto my son Samuel Moore the sum of £200 specie, when he the said Samuel shall come to the age of 21 years, or procure him the said Samuel as much land as shall be judged the full value of said money to be judged by three sufficient freeholders at that time; but if my son Samuel shall die without lawful issue before he comes to the aforesaid age, then my son William Moore to pay one half of the aforesaid sum to my son Thomas Moore." Will proved at Sussex County.

William Moore, devisee, became seised of land by the will. October 27, 1795, William Moore bound himself by bond to convey the said three tracts of lands to Solomon Moore in fee. William Moore died without making deed. November 21, 1799, Outerbridge Horsey and Thomas Robertson, administrators of William Moore, by order of Court of Common Pleas made a deed to Solomon Moore, in compliance with said bond. November 12, 1804, Solomon Moore sold to Thomas Rider one of the tracts of land aforesaid called "Kinkin's Folly," containing 49 acres and "Stilley's Cost," another of said tracts containing 66¼ acres. Same day, deed of bargain and sale by Solomon Moore to Thomas Rider for said tracts of land (no consideration stated) subject to the lien. December 27, 1799, Solomon Moore by deed [of] bargain and sale sold the other tract called "Calloway's Delight" to Jacob Marine in fee simple (125 acres in this tract). Samuel Moore died before he arrived to age of 21 years and before the death of the testatrix Ann LeCompte. Thomas Moore also died intestate, leaving his children and heirs as aforesaid about five years after the death of Ann LeCompte, and about 1797 William Moore died in Cecil County in Maryland. Do not know where letters were granted in his estate. Thomas Robertson lives out of the state. Cannot find where Horsey and Robertson administered on William Moore's estate, not in this state. All the complainants were infants when their father died, and without guard-

ians or friends. Administration first granted on estate of their father, Thomas Moore, to Tacitus Moore, July 21, 1815. Called on Rider and Marine to pay them the money, or to furnish the land, which they refused; and then, the formal part of the bill:

> Prayer, that said Thomas Rider and Jacob Marine may be decreed to pay to complainants the said £100 with the interest from the death of the testatrix, and—

> Prayer. And that the said Thomas Rider and Jacob Marine may be decreed by a decree of this court to be trustees for your orators and oratrixes for the £100 bequeathed as aforesaid, with the interest from the death of the said Ann LeCompte, or for as much land out of the aforesaid tracts or parcels of land as shall be judged the full value of the money, and that the said Thomas and Jacob may be decreed to account for and pay to your orators and oratrixes the said £100 plus the interest as aforesaid or compelled to convey by a deed of bargain and sale duly acknowledged to your orators and oratrixes as tenants in common as much land as shall be judged the full value of said money, out of said three several tracts of land, in such manner and form as this Court shall appoint, and for general relief.

*Vandyke,* for defendants, reads answer of Thomas Rider and Jacob Marine. They have understood and believe Ann LeCompte was seised, made her will, which was proved; they refer to will for devises and bequests. Deny that devise created liens on land devised to William Moore. William Moore contracted with Solomon Moore for sale of land in fee called Kinkin's Folly and Stilley's Cost, and a part of Calloway's Delight. William Moore died before he made deed. Horsey and Robertson made the deed to Solomon Moore. Solomon Moore sold to Thomas Rider the tracts of land, Kinkin's Folly and Stilley's Cost, to Jacob Marine, part of Calloway's Delight. Defendants [deny] that conveyance was subject to any trust lien or encumbrance as set up by the bill. Thomas Rider says that when he contracted with Solomon Moore for said land, and when the deed was executed by Solomon Moore to him, he had not any knowledge or notion of any trust lien or incumbrance under the will of the said Ann LeCompte, but he was a bona fide purchaser for valuable consideration without notice. Jacob Marine, when he contracted and when deed made, had no notice and was bona fide purchaser for valuable consideration without notice.

Defendants do not know when Samuel Moore died, or whether he died without heirs, and know nothing about them; refer to proof. William Moore, devisee, was in easy circumstances;

Thomas Moore, his brother, was in needy circumstances. Presumably this claim was satisfied. Letters of administration on estate of William Moore were granted to Thomas Robertson, O. Horsey, and Moore's widow in Cecil County. Thomas Moore had no claim for land, but, if any, for money, and complainants had no claim as heirs but it must be as representatives.

Answer of Outerbridge Horsey, surviving administrator of William Moore. That William Moore in his life sold the several tracts of land for valuable consideration. Died intestate in Cecil County before he had perfected the title of the purchaser. Thomas Robertson, Jr., and this defendant made deed to Solomon Moore as representatives of William Moore by order of court. Solomon Moore sold to Rider and Marine. Defendant knew not William Moore's title to the land, but he was in possession of, and occupied, and was ostensible owner of the said tracts of land several years before the death of Ann LeCompte, and so continued till he sold to Solomon Moore. That Ann LeCompte never lived on, or occupied or claimed said land to knowledge of this defendant. That she was married before the recollection of this defendant, and in 1783 when she made her will was a *feme covert* and resided in Dorchester County and was the wife of John LeCompte, and died a *feme covert,* wife of said John LeCompte. William Moore died January, 1797. That his brother died Summer or Fall same year, very poor, left his family destitute. Never heard Thomas Moore speak of this claim, nor heard of claim till the bill filed. He says if any claim it has been satisfied.

*Mr. Robinson* reads depositions for complainants.

Levin Collins, Esq., Little Creek Hundred, 41 years. Thomas Moore died a year or two before William. He died in 1797, or 1798. William Moore died about 1800. Thomas Moore left issue, complainants. Knows the three tracts of land. William Moore had possession some years before the death of his mother and until he sold. Calloway's Delight worth $6 per acre, the others $7 or $8 per acre. There was a marriage contract between John LeCompte and Ann Moore his wife. John LeCompte was to give £500 and each to keep their land.

This *Mr. Vandyke* objects is not evidence.

In year 1803 he surveyed Stilley's Cost, Kinkin's Folly, and part of Calloway's Delight for Solomon Moore. They were Maryland grants. Title papers were then in possession of Solomon Moore. Ann LeCompte died in 1791, or 1792. William Moore died insolvent. William Moore entered on land in 1781, or 1782, or 1783.

Amelie Johnson, widow, Little Creek, 53 years. Thomas Moore died September, 1797. Before his death he made vendue and sold

his land, six Negroes, stock and furniture with intention of moving to Georgia. Ann LeCompte left Negroes, legacies, to William Polk whom he received. Left by Ann LeCompte. Knows no other legatees who received their legacies. Thomas Moore said his legacy was not paid. She has heard of the marriage contract, but never saw it. Ann LeCompte died before her husband. Thomas Moore had plenty (before he sold his property). William Polk, grandchild, received Negroes left by Ann LeCompte, but do not know who delivered, whether William Moore, the executor, or by Ann LeCompte.

February 5, 1783, proved May 9, 1792. Will of Ann LeCompte. Devises lands, and money, and Negroes, and furniture to her several children and grandchildren. William Moore, her executor.

October 23, 1772. Indenture, John Stilley to Ann Moore, consideration 5/, for part of a tract of land called Calloway's Delight, granted for 123 acres more or less.

October 23, 1772. Indenture John Stilley to Ann Moore, consideration 5/, for Kinkin's Folly, 49 acres.

Same date. Indenture, same to same, same for Stilley's Costs, 66¼ acres.

October 27, 1795. Bond, William Moore to Solomon Moore. Penalty, £2500, conditioned to convey many tracts of land; these being among them.

November 21, 1799. Thomas Robertson to Outerbridge Horsey to Solomon Moore for same land, grantors were administrators of William Moore.

November 12, 1804. Solomon Moore to Thomas Rider, consideration $1980, for several parcels of land, and among them, Kinkin's Folley, Stilley's Costs.

December 27, 1799. Indenture, Solomon Moore to Jacob Marine for part of Calloway's Delight and for other land.

February 28, 1794. Indenture, Isaac Vaughan to Thomas Moore. Consideration £120 for land near Laurel. This deed was read to contradict Mr. Horsey's testimony, and to show that Thomas Moore was not so poor as he was represented to be in the deposition of Outerbridge Horsey. And to meet a deposition of [——] [1] who says William Moore paid for this land.

November 14, 1796. Indenture, Thomas Moore and wife to John Dashiel, consideration £600. This is in relation to the circumstances of Thomas Moore.

---

[1] Blank in manuscript.

September 10, 1796.   Thomas Moore to George Adams, consideration £50.

July 21, 1815.   Letters of administration to Tacitus Moore on the estate of Thomas Moore.

May 14, 1789, Ephraim Vaughan to Thomas Moore, consideration [——] [2] for land.

May 6, 1789.   Same to same, consideration [——] [3] for land.

These deeds are to meet the testimony as to Thomas Moore's circumstances.

*Vandyke* reads depositions for defendants. °

William Polk, 41 years.   Ann LeCompte, he believes died before her husband John LeCompte.   William Moore died in latter part of 1796.   Thomas Moore in low and indigent circumstances and died so.   Ann and John claimed none of their separate property.   Thomas Moore able to support himself and family while his brother William lived in Sussex.

John Corday, 67 years.   Knew William Moore and Thomas Moore, who was in low circumstances before his death.   William Moore used land until he sold.

George Adams, 63 years.   Knew William Moore.   He died, 1797 or 1798.   Thomas Moore was gradually reducing until his death.

Matthew Kinnikin, 70 years.   Knew John and Ann LeCompte.   They married about 1775.   He says John LeCompte died before his wife, Ann.   About 36 years since William Moore entered into possession of said land.   Thomas Moore told deponent that his brother William Moore was to buy Vaughan's land for him, Thomas, and what the land came to more than William owed him out of the estate of his mother, he, Thomas, was to pay such excess.   When did Thomas buy, before or after his mother's death?

William Moore, 60 years.   Ann LeCompte died before John, she in January, 1792, and he in latter part of same year.   William Moore entered into said land about 1780.

Isaac Vinson, 57 years.   June 7, 1800, patent, State of Delaware for land in Delaware, Sussex County, 270 acres.   Surveyed May 9, 1800, in pursuance of proprietary warrant of resurvey dated March 26, 1776, granted to John LeCompte in behalf of William Moore including vacant land adjoining Kinkin's Folly.

*Robinson* for complainants.   William Moore had it in his election to pay the £200 in cash or in land. . Defendants admit in an-

[2] Blank in manuscript.

[3] Blank in manuscript.

swer will to be duly made, and yet say Ann LeCompte could not devise because she was a *feme covert*. William Moore is executor appointed in the will; he proves or causes it to be proved and recorded. William Moore entered into and holds the land under the will. It is proved that William Moore entered into land by consent of Ann LeCompte. Horsey in 1783 was too young to have any knowledge of the transaction, and in 1792 when will was proved he could not have had much knowledge of the matter. Horsey says the legacy was proved and yet denies that the mother, a *feme covert,* could make a will. He says he never heard of this legacy till the bill was filed; and if he never heard of it how could he know of its payment! Thomas Moore died in 1797, will proved 1792, his only five years, and yet they talk of its being paid by presumption. Thomas Moore died in 1797, no administration until 1815; and no person since his death could receive it. William Moore removed in 1793 or 1794, a year or two after the will was proved. He died in 1797 in Fall; Thomas, January, 1797. Not probable that Thomas compelled William to pay.

As to purchasers without notice. Defendants must be said to have notice, as they hold under the will. Newl.Contr. 511. Law imputes notice which exercise of common diligence must have apprised; and in looking through deed under which party holds, he shall be presumed to have notice of any matter in deed As William Moore holds under the will, he cannot [——] [4]. 2 Ves.Jr. 693, *Wilson v. Lord John Townsend, feme covert* must elect between an annuity by will to her separate use for life charged upon a devised estate, and a title paramount to the same estate in tail. You cannot claim under repugnant deed. A tenant holding under landlord cannot claim against him. Here if Moore claims under the will, he must pay the legacy. 3 Brown Ch.R. 88, *Butrick, Widow v. Broadhurst.* Widow having different interest under her marriaige settlement and husband's will, and proving the will, and acting under it six years held to have made her election. 7 Bac.Abr., title "Election," 449A, 445 first read. No man shall claim in repugnant rights, tenant cannot set up title against landlord. [If] claim under deed, [must] claim under whole deed. He who will take the benefit shall not dispute the title. [*Ibid.*] 449. Personal legacy given with express condition that legatee shall not enjoy unless [5] he conveys a certain estate; he shall not enjoy the legacy unless he conveys the estate whether it came by will or not.

---

4 Blank in manuscript.

5 Manuscript reads "unless in certain."

It may be said this is a lapsed legacy as Samuel Moore died before the testatrix. 2 P.Wms. 479, *Londy v. Williams.* Devise of legacy to infant to be paid at 21, and if he dies before 21, then to another; he, infant dies, the devisee over takes for he holds it is a substantive devise. 2 P.Wms. 271, *Feltham v. Feltham.* Legacy payable to devisee at 21, and if she dies, to be paid over. This legacy is payable at the time the devisee would have arrived at 21, and not lapsed. 4 Bac.Abr. 391, title, "Legacy" E. Plain if there [is] a limitation of legacy, yet if the first legatee dies in life of testator it is not lapsed. Toml.Dig. 114, Devise 1, No. 1. Construction of devises. Devise of lands to *A* for life, remainder to such child or children as should be living at his death, and to their heirs, *A* paying £60 to *B*. This is a charge not only on *A's* estate for life, but also on the remainder. *Ladd v. Carter,* Prec. Ch. 28; Prec.Ch. 258. Legacy 5, 6. If will is void we claim moiety of land, and account for rents and profits, and the bill, answer, and depositions will entitle us to it.

*Vandyke* for defendants. Plaintiff has failed; no proof to support the case made in bill. He says Ann LeCompte was seised in fee, devised the land, and charged it with this legacy. First, was she seised in fee? Second, did she or could she make a will to bind this estate, to transfer it to devisee, or charge the land with a legacy? The counsel has not said that a married woman could make a will. The marriage contract gave her no power to make a will, if there were any such marriage contract. But there is no proof of marriage contract. Counsel has not even argued or relied on it. Then simple whether *feme covert,* and dying also *feme covert* can make a will. Pow.Dev. 142. First Statute of Wills 32 Hen. 8. [By] Statute of Wills, married woman (so the Statute construed) did not include a married woman to devise; none other but such as could alienate land by other conveyance were meant by this Statute. The married woman was disabled, and was not included. 34 Hen. 8, c. 14, explains the Statute, 32 Hen. 8, and excludes married women. She cannot make a will to pass lands. The claim is against Rider and Marine, who are strangers, purchasers for fair and valuable consideration, and without notice, who never heard of will. Presumption against any notice of will. More likely purchasers knew of Mrs. LeCompte's coverture, than that she had made a will. A knowledge that she died a married woman would prevent them from hunting for a will. Pow.Dev. 162. As to personal estate, whether it will pass will depend on assent of husband. Power reserved in deed of settlement for wife to make will. This is by the deed of settlement. The *feme sole* acts under power reserved in the deed of settlement, and is the deed of alienation. Pow.Dev. 166.

Husband cannot give wife power to make will. 2 Ves. 192, *Peacock v. Monk.* Pow.Dev. 166, 167. Wife may dispose of personal estate by agreement of husband; but not so as to real estate. 2 Ves. 191.

As to Negroes and personal estate being disposed of by will, that depended on the husband, but by law she cannot make a will of real estate even with the consent of the husband. As to election, this is sound doctrine; but they do not apply [it]. Here the instrument cannot pass, or charge the land. Again, as to declaring us trustees for complainant, the will, be it what it may, never gave any land to Thomas. Whatever it designed as to Thomas it is clear it was not land. And this land never was given to Samuel. As to conditions precedent or subsequent, in neither case can we be affected. As to lapsed legacy; supposing legacy not lapsed, yet if estate did not vest, according to argument of the counsel, legacy cannot be claimed from us. As to purchasers without notice. Talb. 252, *Mansell v. Mansell.* Breach of trust by trustees, purchaser without notice. *Cestui que trust* cannot affect purchaser.

The heirs of Thomas Moore cannot be parties here. He, Thomas Moore, was not entitled to land; if anything can be claimed it is the administration. The administration is created after suit, and he cannot recover on a bill filed before he had a right to sue. This should be a clear and unexceptional claim. This money has been paid by purchase of Vaughan's land. Family business which had its effect even in life of Mrs. LeCompte.

*Mr. Robinson* replies on behalf of the complainant.

THE CHANCELLOR. According to my view of this case, it is of no importance to determine what effect this instrument of writing, called the will of Ann LeCompte, can have in law, nor whether William Moore had an election to pay £200 and hold the land devised in the will (as I shall call it to avoid circumlocution) or to refuse the payment of the £200 and give up or abandon the land, nor whether he could claim in repugnant rights, nor whether Thomas Rider is such a purchaser without notice that his title cannot be affected by the supposed lien or incumbrance of £200 bequeathed by the said will to Thomas Moore; for I am not only not satisfied that these £200 are still unpaid, but I think that from the evidence in this cause it may rather be presumed that this legacy has been paid.

The will of Ann LeCompte was made February 5, 1783, when she was a married woman. Her son, William Moore, entered into and had the possession of the land some years before her death,

probably about the time of the date of the will. Samuel Moore died before he arrived at the age of twenty-one years and before Ann LeCompte, who died in 1791 or 1792, in the lifetime of her husband. William Moore died in January, 1797, and Thomas Moore in September, 1797. In May, 1789, before the death of Ann LeCompte, Thomas Moore purchased two tracts of land of Ephraim Vaughan, and, according to the testimony of Matthew Kinnikin, Thomas Moore told him that his brother William was to buy Vaughan's land for him, Thomas, and that the excess in the price of the land beyond what William owed him, Thomas, out of the estate of his mother, he, Thomas, was to pay.

From all these circumstances, I am rather disposed to think that Thomas was paid these £200. This seems to have been a family arrangement made by the mother of William and Thomas, with the consent of her husband, which was partly, if not entirely, performed in her lifetime. William entered into the land in her lifetime; and if Kinnikin is to be believed, he satisfied Thomas in the purchase of Vaughan's land. That this was a kind of family settlement seems to be inferred from Thomas's telling Kinnikin that William was to pay for the land from the money he owed Thomas out of his mother's estate. At this time she was not dead, but William was in possession of the land, and therefore he might speak of a debt due to Thomas from her estate. The legacies bequeathed in this will, or some of them, were paid; the Negroes, for instance, to William Polk, her grandchild.

It is probable that there is some truth in the recital in the patent of June 7, 1800, especially as Ann LeCompte, then Ann Moore, the mother of William, paid to John Stilley in 1772 only a nominal consideration for part of Calloway's Delight and for Kinnikin's Folly and Stilley's Costs; the whole exceeding two hundred acres.

Before William Moore removed from Sussex County he was in easy circumstances, and Thomas was needy. The wants of one required the money; the other was able to pay and most likely did pay in the purchase of Vaughan's land. For these reasons, without saying a word about the length of time, or making any presumption of payment from that circumstance, the weight of evidence inclines in favor of the satisfaction of this legacy, if it may be so called; and therefore the bill must be dismissed.

Bill dismissed. Appeal taken.